UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN HELM, | ) | CIVIL ACTION NO. 4:21-CV-705 |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | (ARBUCKLE, M.J.) |
| | ) | |
| DEREK SLAUGHTER, *et al.*, | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

## I.      INTRODUCTION

Steven Helm ("Plaintiff") is a retired Lieutenant formerly employed by the Williamsport Police Department (the "Department"). During most of his twenty-nine-year career with the Department, Plaintiff worked his way up the ranks until he was promoted to Lieutenant in 2008. He was also active in the local lodge of the Fraternal Order of Police. Plaintiff alleges he was, at times, subjected to anti-union animus. He filed two civil rights lawsuits against the City of Williamsport ("the City") in response. Both lawsuits were settled out of court. Although Plaintiff aspired to become assistant police chief, he was bypassed for promotion multiple times. He alleges that he was not promoted in retaliation for filing the two civil rights lawsuits.

The parties in this case have consented to proceed before a United States Magistrate Judge. (Docs. 10, 12).

Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. 20). For the reasons explained in this opinion, Defendants' Motion will be denied.

## II.     BACKGROUND AND PROCEDURAL HISTORY

Before turning to the relevant legal standards, or the merits of the arguments raised in the Parties' Briefs, we will first set the scene with a discussion of the relevant facts and procedural history. In doing so, we will discuss Plaintiff and his history with the City, the process employed by two different mayors to select the police chief and assistant police chief, and the circumstances surrounding Plaintiff's pursuit of a promotion within the Department.

### A.     STEVEN HELM: BACKGROUND AND LITIGATION HISTORY

On May 17, 1993, the City of Williamsport hired Plaintiff as a patrolman. (Doc. 21, p. 24); (Doc. 25-2, p. 10). In 1998 or 1999, Plaintiff was promoted to corporal. (Doc. 21, p. 24); (Doc. 25-2, p. 10). In 1999 or 2000 Plaintiff was promoted to sergeant. (Doc. 21, p. 24); (Doc. 25-2, p. 10). In 2008 Plaintiff was promoted to lieutenant. (Doc. 21, p. 25); (Doc. 25-2, p. 11). Plaintiff retained his rank as a lieutenant until he retired. (Doc. 21, pp. 19, 25); (Doc. 25-2, pp. 5, 11). Plaintiff retired from the Williamsport Police Department on April 29, 2022. (Doc. 22, p. 3, ¶ 1); (Doc. 25, ¶ 1). Plaintiff was President of the Fraternal Order of Police Lodge

29 from 1996 until 2022 (except for one year, possibly 2020). (Doc. 21, p. 35); (Doc. 25-2, p. 20).

### 1.    Plaintiff's Participation in the DROP Program

The Department has a pension benefit called the Deferred Retirement Option Plan ("DROP"). (Doc. 25-11, p. 8). The DROP is "a type of retirement or pension benefit available to certain public employees of the Commonwealth of Pennsylvania." *Id.* When a police officer enters the DROP, the officer stops contributing to the pension plan while still collecting a paycheck, and a pension benefit is paid into an account in their name that may be accessed after the officer retires. *Id.*

A police officer can enter the DROP up to five years before he or she retires. (Doc. 21, p. 3, ¶ 3); (Doc. 25, ¶ 3). The parties disagree as to whether a party *must* retire within five years. Defendants assert that an employee must retire within five years of entering the DROP, while Plaintiff produced evidence that suggests, "while most DROP plan documents indicate the election to separate on a specified date is irrevocable, that election is waivable by the parties." (Doc. 21, p. 3, ¶ 3); (Doc. 25-11, p. 12). Plaintiff has also submitted some evidence that City employees have been permitted to revoke their DROP election. (Doc. 25-11, p. 12).

Plaintiff entered the DROP program on March 30, 2017, more than two years before he sought the promotions at issue. (Doc. 21, p. 3, ¶ 2); (Doc. 25, ¶ 2).

### 2. Plaintiff's Litigation History Involving the City of Williamsport

During his career with the Williamsport Police Department, Plaintiff filed a total of three civil rights lawsuits (this lawsuit and two prior lawsuits alleging claims he was retaliated against due to his involvement with the Fraternal Order of Police) against the City. (Doc. 1, ¶ 11).[1]

On April 13, 2017, Plaintiff filed his first civil rights lawsuit.[2] In his Complaint, Plaintiff asserted claims of retaliation against two of the City's police chiefs (Gregory Foresman and David Young), a police captain (Timothy Miller), and the City.[3] Plaintiff alleged that the Department initiated two lengthy misconduct investigations, and a police captain wrote a memo accusing Plaintiff of sharing confidential information with his wife, in retaliation for Plaintiff's union activities.

On November 21, 2018, Plaintiff filed a second civil rights lawsuit.[4] In this lawsuit, Plaintiff asserted claims of retaliation against a police chief (David Young), a police captain (Jody Miller), and the City.[5] Plaintiff alleged that Jody Miller and

---

[1] *See also* Complaint, *Helm v. Foresman*, No. 4:17-CV-00669-MEM (M.D. Pa. Apr. 13, 2017), ECF No. 1 (hereinafter "*Helm I*"); Complaint, *Helm v. Young*, No. 4:18-CV-2243-MEM (M.D. Pa. Nov. 21, 2018), ECF No. 1 (hereinafter "*Helm II*").

[2] Complaint, *Helm I*, No. 4:17-CV-00669-MEM (M.D. Pa. Apr. 13, 2017), ECF No. 1.

[3] *Id.*

[4] Complaint, *Helm II*, No. 4:18-CV-2243-MEM (M.D. Pa. Nov. 21, 2018), ECF No. 1.

[5] *Id.*

David Young gave him low ratings on a performance review in retaliation for his service as President of the local chapter of the Fraternal Order of Police.[6]

On March 13, 2019, *Helm I* and *Helm II* were referred to mediation.[7] On June 14, 2019, a stipulation of dismissal was filed in both cases.[8]

On April 15, 2021, Plaintiff initiated this action, his third civil rights lawsuit. (Doc. 1). In this lawsuit, Plaintiff asserts claims of retaliation against two City Mayors (Gabriel Campana, and Derek Slaughter) and the City. He alleges that the two mayors passed him over for promotions in 2019 and 2020 because of his prior lawsuits.[9] After completing discovery, Defendants filed a motion for summary judgment. (Doc. 20). That motion is fully briefed and is the subject of this opinion. (Docs. 21, 22, 25, 26, 27, 28).

---

[6] *Id.*

[7] Order Referring Case to Mediation, *Helm I*, No. 4:17-CV-00669-MEM (M.D. Pa. Mar. 13, 2019), ECF No. 78; Order Referring Case to Mediation, *Helm II*, No. 4:18-CV-2243-MEM (M.D. Pa. Mar. 13, 2019), ECF No. 21.

[8] Stipulation of Dismissal, *Helm I*, No. 4:17-CV-00669-MEM (M.D. Pa. June 14, 2019), ECF No. 79; Stipulation of Dismissal, *Helm II*, No. 4:18-CV-2243-MEM (M.D. Pa. June 14, 2019), ECF No. 22.

[9] In his brief in opposition, Plaintiff acknowledges that the failure to promote him to police chief or assistant police chief in January 2019 are not substantive claims in this action, as they are outside the statute of limitations. (Doc. 26, p. 19 n.1).

**B.    SELECTION PROCESS FOR WILLIAMSPORT POLICE CHIEF AND ASSISTANT POLICE CHIEF**

The City's mayor is responsible for appointing its police chief, assistant police chief, and captain. (Doc. 21, p. 4, ¶ 6); (Doc. 25, ¶ 6). During the period relevant to this action, the City had two mayors: Defendant Campana, and Defendant Slaughter. Defendant Campana held this office for twelve years, until early January 2020. (Doc. 21, pp. 117, 784); (Doc. 25-3, p. 6; Doc. 25-4, p. 5). Defendant Slaughter was sworn in as Mayor on January 6, 2020. (Doc. 21, p. 784); (Doc. 25-3, p. 6).

Both Defendant Campana and Defendant Slaughter were called upon to fill vacancies in these appointed positions during their tenure, but each employed a different selection process.

Defendant Campana did not have a formal application process or hold formal interviews to select the candidates for police chief, assistant police chief, or captain. (Doc. 21, p. 4, ¶ 7); (Doc. 25, ¶ 7). Instead, Defendant Campana relied on experience interacting with the Department to select an individual who was the "right fit" for his administration. (Doc. 21, p. 4, ¶ 7); (Doc. 25, ¶ 7).

Defendant Slaughter used a more formal application process, but also chose not to hold interviews. When two vacancies opened in the Department, Defendant Slaughter posted the positions and solicited applications from internal candidates. (Doc. 21, p. 10, ¶ 66); (Doc. 25, ¶ 66). The applications received were circulated to a committee. (Doc. 21, p. 11, ¶ 68); (Doc. 25, ¶ 68). Defendant Slaughter discussed

the candidates with the committee before making final selections himself. (Doc. 21, p. 11, ¶ 74); (Doc. 25, ¶ 74).

### C. FAILURE TO PROMOTE PLAINTIFF TO POLICE CHIEF IN JANUARY 2019

In the fall of 2018, the current police chief (David Young) announced his intention to retire. (Doc. 1, ¶ 15).[10] Defendant Campana was the mayor at that time, and therefore was responsible for selecting a replacement. Defendant Campana did not post the job, solicit applications, or conduct interviews to fill the role.

Initially, Defendant Campana planned to promote Jody Miller, but changed his mind because Jody Miller circulated an inappropriate email. (Doc. 21, p. 124); (Doc. 25-4, p. 11). After deciding not to promote Jody Miller, Defendant Campana was leaning towards appointing Marvin "Doc" Miller, a retired officer, to be police chief. (Doc. 21, p. 127); (Doc. 25-4, p. 15). Around the same time, Doc Miller approached Defendant Campana, and recommended Plaintiff as a candidate for the police chief position. (Doc. 21, pp. 125-27); (Doc. 25-4, pp. 13, 15). Defendant Campana did not agree.[11]

---

[10] During his deposition, Plaintiff testified that David Young was an outside hire who was police chief from 2015 to 2017. (Doc. 21, pp. 30-31); (Doc. 25-2, pp. 16-17). Plaintiff felt that David Young targeted Plaintiff and tarnished Plaintiff's reputation because Plaintiff was a union advocate. (Doc. 21, pp. 30-31); (Doc. 25-2, pp. 16-17).

[11] The reason why Defendant Campana did not agree with the recommendation is in dispute. Doc Miller stated that when he recommended Plaintiff for the police chief position, Defendant Campana responded that he could not

Doc Miller initially accepted the police chief position. (Doc. 21, p. 127); (Doc. 25-4, p. 14). Defendant Campana asked Doc Miller "who would [he] take as [his] assistant?" (Doc. 21, pp. 483-83); (Doc. 25-9, pp. 11-12). Doc Miller requested that Plaintiff be his assistant police chief. (Doc. 21, pp. 483-83); (Doc. 25-9, pp. 11-12).[12] Although it was announced that Doc Miller would be the new police chief, Doc Miller stepped down before he began work for the City. (Doc. 21, pp. 483-84); (Doc. 25-9, pp. 12-13).[13] Ultimately, Defendant Campana promoted Damon Hagan to fill the vacant police chief position.

Plaintiff acknowledges that this incident occurred outside of the statute of limitations and therefore does not form the basis of any substantive claim in this lawsuit.

---

promote Plaintiff because "[h]e's got the lawsuits." (Doc. 21, p. 480); (Doc. 25-9, p. 9). Defendant Campana offered the position to Doc Miller instead. (Doc. 21, p. 483); (Doc. 25-9, p. 11). Defendant Campana, however, stated that he did not think Plaintiff was a good candidate based on a "general feeling" that they would not work well together. (Doc. 21, p. 128); (Doc. 25-4, p. 16).

[12] Once again, Doc Miller recalled that Defendant Campana said he could not promote Plaintiff "because of the lawsuits." (Doc. 21, p. 483); (Doc. 25-9, p. 12). Defendant Campana stated that he did not think Plaintiff was a good candidate based on a "general feeling" that they would not work well together. (Doc. 21, p. 128); (Doc. 25-4, p. 16).

[13] Doc Miller explained during his deposition that at that time the City had the budget to employ 47 officers. (Doc. 21, p. 484); (Doc. 25-9, p. 13). If Doc Miller was promoted, one officer would need to be let go. (Doc. 21, p. 484); (Doc. 25-9, p. 13). Doc Miller stepped down because he did not want any current officer to lose his or her position. (Doc. 21, p. 484); (Doc. 25-9, p. 13).

**D.     FAILURE TO PROMOTE PLAINTIFF TO ASSISTANT POLICE CHIEF IN JANUARY 2019**

When Damon Hagan was promoted, it left a vacancy in the department for an assistant police chief. Defendant Campana was Mayor at the time and was responsible for appointing a new assistant police chief. (Doc. 21, p. 6, ¶ 28); (Doc. 25, ¶ 28). There was no application process, and no interviews were held. Plaintiff stated during deposition that he expressed his interest in the position by submitting a letter of interest and resume to Damon Hagan and by having a verbal conversation with Damon Hagan. (Doc. 21, p. 36); (Doc. 25-2, p. 22).

Defendant Campana and Damon Hagan discussed who Hagan would like to be his assistant police chief. (Doc. 21, p. 705); (Doc. 25-5, p. 9). Damon Hagan stated that he "told the mayor that [he] wanted [Plaintiff] and [the mayor] did not want Plaintiff as the assistant chief." (Doc. 21, p. 705); (Doc. 25-5, p. 9). Defendant Campana, however, stated that he did not recall who Damon Hagan requested, and did not recall Damon Hagan requesting Plaintiff. (Doc. 21, p. 138); (Doc. 25-4, p. 25). Ultimately, Aaron LeVan was selected for the Assistant Chief position.

There is also a dispute as to how the recommendations were presented to Defendant Campana. Plaintiff asserts that Damon Hagan told Defendant Campana that he wanted to promote Plaintiff to assistant police chief, and recommended Aaron LeVan and Justin Snyder only after Plaintiff's candidacy was rejected. (Doc. 25, ¶¶ 58, 60). Defendants, however, contend that Damon Hagan recommended

three candidates (Plaintiff, Aaron LeVan, and Justin Snyder), and one of those candidates (Aaron LeVan) was selected. (Doc. 21, pp. 9-10, ¶¶ 59-60).

At deposition, Damon Hagan stated that Plaintiff was "always" his first choice for assistant police chief. (Doc. 21, p. 503).

The parties do not dispute that Aaron LeVan was qualified for the position. (Doc. 21, p. 6, ¶ 22); (Doc. 25, ¶ 22). Plaintiff contends, however, that he was more qualified than Aaron LeVan. (Doc. 25, ¶ 22).

Plaintiff acknowledges that this incident occurred outside of the statute of limitations and therefore it does not form the basis of any substantive claim in this lawsuit.

### E.   FAILURE TO PROMOTE PLAINTIFF TO ASSISTANT POLICE CHIEF IN SEPTEMBER 2019

In September 2019, Aaron LeVan stepped down as assistant police chief. (Doc. 1, ¶ 27). Defendant Campana was the mayor and was responsible for filling this vacancy. (Doc. 21, p. 6, ¶ 28); (Doc. 25, ¶ 28). Plaintiff stated during deposition that when Aaron LeVan stepped down, Damon Hagan asked Plaintiff if he was interested in the position, to which Plaintiff said "absolutely." (Doc. 21, p. 39); (Doc. 25-2, p. 25). Damon Hagan (the current police chief) recommended that Defendant Campana promote Plaintiff to assistant police chief. (Doc. 21, p. 712); (Doc. 25-5,

p. 15). Another candidate, Mark Sechrist, was selected. (Doc. 21, p. 6, ¶ 23); (Doc. 25, ¶ 23).[14]

Mark Sechrist had been a patrolman for his entire career. (Doc. 25, ¶ 25). Plaintiff believed Mark Sechrist was not qualified for the position of assistant police chief. (Doc. 21, p. 6, ¶ 25); (Doc. 25, ¶ 25). Mark Sechrist served as the union treasurer for 15-20 years. (Doc. 21, p. 6, ¶¶ 26-27); (Doc. 25, ¶¶ 26-27). Plaintiff alleges that he was not promoted because of *Helm I* and *Helm II*. Defendants dispute this allegation.

### F.   FAILURE TO PROMOTE PLAINTIFF TO ASSISTANT POLICE CHIEF IN OCTOBER 2020

When Mark Sechrist announced his retirement, the City solicited applications for his replacement, as well as applications for a captain position in September 2020. (Doc. 21, p. 10, ¶ 66); (Doc. 25, ¶ 66); (Doc. 25-12, p. 7). The job listing instructed internal applicants to "submit a resume along with a letter of interest including the job or jobs you are seeking and how your skills and experience make you an excellent candidate." (Doc. 25-12, p. 7). The job posting required that candidates for the assistant chief position have "at least 10 years of service with the Bureau with at

---

[14] At deposition, Mark Sechrist stated that he did not apply or express interest in the position of Assistant Chief. (Doc. 21, pp. 232-33); (Doc. 25-8, p. 5). He received a phone call from Damon Hagan on a Saturday asking if he was interested in the position. (Doc. 21, pp. 232-33); (Doc. 25-8, p. 5). Mark Sechrist told Damon Hagan that he would have to think about it, then called Damon Hagan the next morning and agreed to take the job. (Doc. 21, pp. 232-33); (Doc. 25-8, p. 5).

least one year as a supervisor or agent." *Id*. Defendant Slaughter was the mayor at this time and was responsible for filling the vacancy.

Six of the City's police officers applied for the vacant positions: Fred Miller, Jody Miller, Marlin Smith, Jason Bolt, Justin Snyder, and Plaintiff. All candidates were internal. (Doc. 21, p. 11, ¶ 70); (Doc. 25, ¶ 70). Of these six candidates, three sued the City in the past (Fred Miller, Jody Miller, and Plaintiff), and three never sued the City (Marlin Smith, Jason Bolt, and Justin Snyder). (Doc. 21, p. 205); (Doc. 25-6, p. 26).

Fred Miller submitted a two-page letter of interest, a resume, and his training portfolio. (Doc. 25-12, pp. 8-14). He also submitted a letter of reference from the Lycoming County District Attorney. (Doc. 25-12, p. 15). At the time, Fred Miller had over twenty years of experience with the Department, including four years as an agent and one year as a Lieutenant. (Doc. 25-12, p. 11).

Jody Miller submitted a letter of interest, a resume, and his training portfolio. (Doc. 25-12, pp. 16-35). At the time, Jody Miller had twenty-one years of law enforcement experience, and four years of command/supervisory experience as a sergeant. (Doc. 25-12, p. 16).

Plaintiff submitted a letter of interest, cover letter, a resume, and his training portfolio. (Doc. 25-12, pp. 36-41, 44-45). At the time, Plaintiff had twenty-seven years of experience with the Department and had been a lieutenant for twelve years.

*Id.* Plaintiff also submitted letters of reference from Adam Winder (a police officer) and Gary A. Whiteman (a former chief of police). (Doc. 25-12, pp. 42-43).

Marlin Smith submitted a letter of interest, and a resume. (Doc. 25-12, pp. 47-50). At the time, Marlin Smith had approximately thirteen years of law enforcement experience and over five years of supervisory experience. *Id.* He was promoted to lieutenant in February 2019. *Id.*

Jason Bolt submitted a resume. (Doc. 25-12, p. 52). No letter of interest is included in the summary judgment record. Joellen Chappelle Gilbert (from Human Resources) does not recall whether Bolt submitted a letter of interest. (Doc. 25-6, p. 17). Jason Bolt stated he did submit a letter of interest. (Doc. 25-10, p. 12). His resume suggests that, at the time he had sixteen years of experience in law enforcement, and four years of experience as an agent. (Doc. 25-12, p. 52). He was promoted to lieutenant in 2020. *Id.*

The summary judgment record does not include Justin Snyder's application materials.

A committee was created to review the candidates and provide guidance to Defendant Slaughter. (Doc. 21, p. 11, ¶¶ 68-74); (Doc. 25, ¶¶ 68-74). The members of that committee included: Joellen Chappelle Gilbert (the City's human resources director), Damon Hagan (police chief), Mark Sechrist (retiring assistant police

chief), Janice Lee Holmes (Defendant Slaughter's executive assistant), and Defendant Slaughter. (Doc. 21, p. 11, ¶ 73); (Doc. 25; ¶ 73).

One committee meeting was held, during which the committee members discussed the candidates based on their written application materials and their personal familiarity with the applicants. After reviewing the applications, the two police officers (Damon Hagan and Mark Sechrist) recommended Plaintiff for the position of assistant police chief, and Fred Miller as captain. (Doc. 21, pp. 717-18, 236); (Doc. 25-5, pp. 21-22; Doc. 25-8, p. 9). Neither candidate was selected for promotion.

Defendant Slaughter initially selected Marlin Smith for the position of assistant police chief, and Justin Snyder as the captain. (Doc. 21, pp. 805, 812); (Doc. 25-3, p. 27, 34). Shortly after Defendant Slaughter reached this decision, however, Marlin Smith withdrew his application. (Doc. 21, p. 13, ¶ 81); (Doc. 25; ¶ 81).

Once Marlin Smith withdrew his name from consideration, Defendant Slaughter decided not to hire an assistant police chief at all. Instead, Defendant Slaughter decided to hire a second captain. (Doc. 21, p. 42); (Doc. 25-2, p. 28); (*see also* Doc. 1, ¶ 70). There is a dispute as to why this change was made. (Doc. 21, p. 7, ¶ 33); (Doc. 25, ¶ 33). Jason Bolt was hired to fill the newly created captain of patrol position. (Doc. 21, p. 7, ¶ 34); (Doc. 25, ¶ 34). Fred Miller, Jody Miller, and

Plaintiff (the three employees who sued the City in the past) were not selected for promotion.

Plaintiff alleges that he was not promoted because of *Helm I* and *Helm II*. Defendants dispute this allegation.

## III.    LEGAL STANDARDS

Having reviewed the relevant factual background and procedural history, we now turn to the relevant legal standards. We will discuss the standards for resolving motions for summary judgment, and the elements Plaintiff must prove to prevail on a First Amendment Retaliation claim brought under 42 U.S.C. § 1983.

### A.    FEDERAL RULE OF CIVIL PROCEDURE 56: MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15] A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.[16] For a dispute to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be

---

[15] Fed. R. Civ. P. 56(a).

[16] *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[17]

A party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact."[18] "If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways."[19] First, the party moving for summary judgment "may submit affirmative evidence that negates an essential element of the nonmoving party's claim."[20] Second, the party moving for summary judgment "may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[21]

Once the party moving for summary judgment has met its burden, "the non-moving party must rebut the motion with facts in the record and cannot rest solely

---

[17] *Id.* (quoting *Anderson,* 477 U.S. at 248-49).

[18] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[19] *Id.* at 331 (Brennan, J., dissenting); *see also Finley v. Pennsylvania Dep't. of Corrections*, 2015 WL 1967262, at *9 n.1 (M.D. Pa. Apr. 30, 2015) (observing that the Third Circuit has found that Justice Brennan's dissent in *Celotex* "does not differ with the opinion of the Court regarding the appropriate standards for summary judgment) (citing *In re Bressman*, 327 F.3d 229, 337 n.3 (3d Cir. 2003) and *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987)).

[20] *Id.*

[21] *Id.*

on assertions made in the pleadings, legal memoranda, or oral argument."[22] To show that there is a genuine dispute of material fact, the non-moving party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."[23] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is appropriate.[24] Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.[25]

Finally, when ruling on a motion for summary judgment, it is not the province of the court to weigh evidence or assess credibility. It must view the evidence presented and draw all inferences in the light most favorable to the non-moving party.[26] The court may not decide whether the evidence unquestionably favors one side or the other or make credibility determinations.[27] Instead, it must decide whether

---

[22] *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *Celotex*, 477 U.S. at 324.

[23] Fed. R. Civ. P. 56(c)(1)(A).

[24] *Celotex*, 477 U.S. at 322.

[25] *Anderson*, 477 U.S. at 249.

[26] *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Davis v. Mountaire Farms Inc.*, 453 F.3d 554, 556 (3d Cir. 2006)).

[27] *Anderson*, 477 U.S. at 252.

a fair-minded jury could return a verdict for the non-movant on the evidence presented.[28] The Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.[29]

In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[30]

### B.   ELEMENTS OF A FIRST AMENDMENT RETALIATION CLAIM BROUGHT UNDER 42 U.S.C. § 1983

Plaintiff's First Amendment retaliation claim is brought under 42 U.S.C. § 1983. "Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."[31] "It is well settled that § 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'"[32] To establish a claim

---

[28] *Id.*

[29] *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[30] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587.

[31] *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

[32] *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

under § 1983, Plaintiff must establish a deprivation of a federally protected right and that this deprivation was committed by a person acting under color of state law.[33]

In his complaint, Plaintiff alleges claims that his First Amendment rights were violated when two mayors declined to promote him because he filed two prior lawsuits against the City. He also alleges that the City adopted a policy or custom of retaliating against employees who sued the City by refusing to promote them.

To prevail on his retaliation claim against Defendants Campana and Slaughter at trial, Plaintiff must prove that: (1) he engaged in constitutionally protected conduct; (2) Defendants Campana and Slaughter engaged in "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights;" and (3) there is a causal link between the protected conduct and retaliatory action.[34] "If a plaintiff satisfies these elements, [Defendants] may avoid liability if [they] can show by a preponderance of the evidence that [they] would have taken the adverse action 'even in the absence of the protected conduct.'"[35]

A municipality, like the City, is not vicariously liable under § 1983 for the actions of its officials.[36] Municipalities can, however, be held liable "when execution

---

[33] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

[34] *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)).

[35] *Id.* (quoting *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008)).

[36] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (explaining that although municipalities can be liable as "persons" under § 1983, this liability extends only to its own illegal acts) (quoting *Pembauer v. Cincinnati*, 475 U.S. 469, 479 (1986)).

of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under § 1983."[37] "Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict."[38] Customs are "'practices of state officials . . . so permanent and well settled' as to virtually constitute law."[39] Thus, "[l]iability is imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees."[40]

## IV.    DISCUSSION

Defendants set forth five arguments, in the following order, to support their motion for summary judgment:

> (1)    Based on the undisputed material facts, no reasonable juror could conclude that Defendants' conduct deterred Plaintiff from exercising his First Amendment rights.

> (2)    Based on the undisputed material facts, no reasonable juror could infer causation because there is not "unusual temporal proximity" between

---

[37] *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[38] *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)).

[39] *Id.*

[40] *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Colburn v. Upper Darby Twp*, 946 F.2d 1017, 1027 (3d Cir. 1991)) (internal quotations omitted).

Plaintiff's prior lawsuits and the non-promotion, and there is no evidence Defendants engaged in a pattern of antagonism.

(3)     Plaintiff has no evidence that the City had a policy or custom of retaliating against employees who file lawsuits against it by refusing to promote them.

(4)     Based on the undisputed facts, Defendants Campana and Miller were not personally involved retaliating against Plaintiff for his past lawsuits.

(5)     Based on the undisputed facts, Defendants are entitled to summary judgment because Plaintiff did not suffer compensatory damages.

We will begin our analysis by addressing Defendants' fourth argument, then will address arguments one, two, three, and five.

### A.     A REASONABLE JURY COULD CONCLUDE DEFENDANTS' CAMPANA & SLAUGHTER WERE INVOLVED IN THE DECISION NOT TO PROMOTE PLAINTIFF

Defendants, relying on *Fiedler v. Stroudsburg Area Sch. Dist.*, 427 F.Supp.3d 539, 551 (M.D. Pa. 2019), argue that they are entitled to summary judgment because Plaintiff "has no evidence" that Defendants Campana or Slaughter "acquiesced or knew of actions by subordinates to infringe upon Plaintiff's first amendment rights." Plaintiff's Complaint does not contain allegations necessary to support a supervisory liability claim against Defendants Campana or Slaughter, likely because he is not alleging a supervisory liability claim. There can be no dispute, however, that Plaintiff has alleged enough facts to support a claim of direct liability against Defendants Campana and Slaughter arising from their own conduct (as opposed to conduct by their subordinates). We also find that the summary judgment record

contains enough evidence to create a triable issue of fact. The parties do not dispute that Defendant Campana made the decision not to promote Plaintiff in September 2019. (Doc. 21, p. 6, ¶ 28); (Doc. 25, ¶ 28) and Defendant Slaughter made the decision not to promote Plaintiff in October 2020. (Doc. 21, p. 13, ¶ 84); (Doc. 25, ¶ 84). This is sufficient to establish personal involvement for Plaintiff's § 1983 claim.

Accordingly, summary judgment will be denied on this basis.

**B.    A REASONABLE JURY COULD CONCLUDE THAT THE FAILURE TO PROMOTE EMPLOYEES WHO FILE CIVIL RIGHTS LAWSUITS AGAINST THEIR EMPLOYER WOULD DETER A PERSON OF REASONABLE FIRMNESS FROM FILING CIVIL RIGHTS LAWSUITS**

In their first argument, Defendants contend that Plaintiff cannot prove Defendants' actions were sufficient to deter him from continuing to exercise his First Amendment rights. Essentially, Defendants argue there is no triable issue of fact because Plaintiff cannot satisfy the second element of his retaliation claims against Defendants Campana and Slaughter. In support of their position, Defendants argue:

> Subsequent to the filing of this action, Plaintiff commenced another lawsuit against the City of Williamsport and Slaughter based upon similar claims. *Steven Helm v. Derek Slaughter and City of Williamsport*, Lycoming County Court of Common Pleas, No. 22-CV-00219. Essentially, Plaintiff has demonstrated through his own actions that the fact that he was not promoted has not had a deterrent effect. Plaintiff has continued to exercise his First Amendment Rights. Furthermore, Plaintiff's colleague, Fred Miller, filed near-identical lawsuits to this one and Plaintiff's state court action subsequent to the commencement of this action. *Fred Miller v. Derek Slaughter and City of Williamsport*, Lycoming County Court of Common Pleas, No. 22-

> CV-00308. Although Plaintiff may argue that a person of ordinary firmness would be deterred, his conduct is directly contradictory to such an assertion.

(Doc. 22, pp. 7-8).

In response, Plaintiff argues that Defendants misstate the law, and that Plaintiff is not required to prove that *he* was deterred from continuing to engage in protected conduct. (Doc. 26, p. 17).

In their reply, Defendants argue that Fred Miller—another applicant for the two vacant positions in late 2020—also filed a lawsuit alleging Defendant Slaughter's failure to promote was retaliatory. (Doc 27, p. 5). They suggest that this is evidence that a person of ordinary firmness would not have been deterred from continuing to exercise his constitutional rights. *Id.*

Regarding the second element of Plaintiff's retaliation claims against Defendants Campana and Slaughter, the key inquiry is whether denying promotions to employees who have filed lawsuits against the City would sufficiently deter *a person of ordinary firmness* from exercising his or her constitutional rights. Therefore, it is not material that Plaintiff himself was not actually deterred.

Applying the correct standard, Defendants' argument is unavailing. Although the effect of an employer's retaliatory conduct must be more than *de minimis*, it need

not be "great" to be actionable.[41] Plaintiff alleges that he was denied two promotions because he exercised his First Amendment rights. Defendants do not challenge Plaintiff's allegation that filing *Helm I* and *Helm II* amounts to protected speech. Courts have found that a reasonable factfinder *could* conclude a person of ordinary firmness would be deterred from exercising their First Amendment rights where an employer retaliates by denying promotions, transfers, recalls after layoffs, or assigning low rankings on a promotion list.[42] This case presents a similar scenario, and therefore we also conclude a reasonable factfinder could find that denying promotions to qualified individuals who exercised their rights in the past by filing civil rights lawsuits against their employer would deter a person of ordinary firmness from exercising their First Amendment rights.

Accordingly, summary judgment will be denied on this basis.

---

[41] *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

[42] *Rutan v. Republican Party*, 497 U.S. 62, 73 (rejecting the argument that denying a promotion would not deter a person of ordinary firmness and concluding that "[e]mployees who find themselves in dead-end positions due to their political backgrounds are adversely affected. They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder."); *Suppan*, 203 F.3d at 235 (finding a factfinder could determine that assigning police officers active in the local union artificially low rankings on a promotion list was sufficient to deter a person from ordinary firmness from exercising his First Amendment rights).

C.     WHETHER THERE IS A TRIABLE ISSUE OF FACT AS TO CAUSATION

The third element of a First Amendment retaliation claim requires that Plaintiff show a causal link between the protected activity (filing *Helm I* and *Helm II*) and the retaliatory action (declining to promote Plaintiff in September 2019 and October 2020). Plaintiff can establish the requisite causal connection by showing either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[43] The Third Circuit has "also observed that if such evidence is lacking, an employee may nevertheless prove causation 'from evidence gleaned from the record as a whole.'"[44]

> **1.     There is a Genuine Issue of Material Fact as to Whether Plaintiff's Protected Conduct is Connected to Defendant Campana's Decision Not to Promote Plaintiff in September 2019**

As it pertains to Plaintiff's claim against Defendant Campana, the protected activity at issue is filing two lawsuits—*Helm I* and *Helm II*. *Helm I* was filed on April 13, 2017. *Helm II* was filed on November 21, 2018. Both lawsuits were settled on June 14, 2019. Plaintiff alleges that he was not promoted to assistant police chief in September 2019 because he filed *Helm I* and *Helm II*.

---

[43] *Baloga*, 927 F.3d at 759 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[44] *Id.* at 267 n.14 (quoting *Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018)).

Defendants argue that no reasonable trier of fact could conclude that there is a causal connection between the September 2019 failure to promote and *Helm I* and *II*. They assert that: (1) there is no pattern of antagonism demonstrated in the records, (Doc. 22, p. 9); and (2) the temporal proximity between the litigation (which terminated in June 2019) and the failure to promote Plaintiff three months later is not unusually close. (Doc. 22, p. 10).

In response, Plaintiff argues there is sufficient evidence of causation "by way of temporal proximity and evidence in the record as a whole suggesting causation." (Doc. 26, p. 19).

We find that Plaintiff has produced sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendant Campana's decision not to promote Plaintiff in September 2019 was related to his protected speech (*Helm I* and *Helm II*). First, Plaintiff has provided evidence that suggests Plaintiff was considered (by some current and former Williamsport Police officers) to be one of the most qualified candidates for three promotional opportunities and Defendant Campana refused to promote him.[45] Second, Plaintiff has provided some evidence that

---

[45] First, when asked by Defendant Campana who he would recommend, Doc Miller recommended Plaintiff as the top choice to fill the police chief position in January 2019. (Doc. 25-9, p. 8). Doc Miller stated during deposition that Defendant Campana responded to the recommendation by saying Plaintiff could not be promoted because Plaintiff had the lawsuits. *Id.* Defendant Campana also stated during deposition that Doc Miller is a person Defendant Campana trusts, and that

Defendant Campana was aware of the lawsuits, and that Defendant Campana considered them as a factor when he declined to promote Plaintiff in January 2019.[46]

Therefore, we find Plaintiff has produced enough evidence to allow a reasonable jury to conclude that Plaintiff's prior lawsuits were a substantial factor

---

Doc Miller recommended Plaintiff for the police chief position to replace Dave Young. (Doc. 21, pp. 125-126).

Second, when Doc Miller was initially hired to be police chief in January 2019 (he stepped down before taking office), Doc Miller requested that Plaintiff be his Assistant Chief. (Doc. 21, pp. 482-482). Defendant Campana denied this request. *Id.* Damon Hagan was hired as police chief when Doc Miller stepped down. When Damon Hagan was asked by Defendant Campana who he wanted as assistant police chief in January 2019, Damon Hagan said that he "wanted Steve [Helm] and [Defendant Campana] did not want Steve as the assistant chief." (Doc. 25-5, p. 9). Damon Hagan did not ask why and agreed to choose another candidate. Thus, Defendant Campana refused to hire Plaintiff as assistant police chief in 2019 after two separate police chief hires recommended Plaintiff.

Third, in August 2019, Defendant Campana asked Damon Hagan a second time who he wanted to promote to fill the assistant police chief vacancy, and Hagan once again recommended Plaintiff. (Doc. 25-5, pp. 13-14). Defendant Campana again told Hagan no. *Id.*

[46] After Doc Miller initially accepted the police chief position, Defendant Campana discussed who should be Assistant Chief. Doc Miller provided the following statements at deposition about that conversation:

[Defendant Campana] said, who would you take as your assistant? I said again, [Plaintiff]. [Defendant Campana] said, that's the person you want. [Defendant Campana] goes, I can't put [Plaintiff] there. [Defendant Campana] says, can you work with Damon? I said, can I work with him? Yes. Would I want to? No. But that's your choice. You can make those choices. [Plaintiff] is the one you want.
[Defendant Campana] goes, I can't promoted[sic] [Plaintiff] because of the lawsuits. I said, any other reasons? No. The lawsuits. I can't because of the lawsuits. I said, all right, fine, I'll take the position and you can put Damon there. I'd prefer something other, but, yeah. So that's how it ended up.

(Doc. 21, pp. 482-482).

motivating Defendant Campana's decision not to promote Plaintiff in September 2019. Therefore, Defendants' Motion for Summary Judgment will be denied on this basis.

> **2.      There is a Genuine Issue of Material Fact as to Whether Plaintiff's Protected Conduct is Connected to Defendant Slaughter's Decision Not to Promote Plaintiff in October 2020**

As it pertains to Plaintiff's claim against Defendant Slaughter, Plaintiff's claim is based on the same protected conduct—filing *Helm I* and *Helm II*. Plaintiff alleges that this protected activity substantially motivated Defendant Slaughter not to promote Plaintiff in October 2020.

Defendants argue that no reasonable trier of fact could conclude that there is a causal connection between the October 2020 failure to promote Plaintiff and *Helm I* and *II*. They assert that: (1) there is no pattern of antagonism demonstrated in the records, (Doc. 22, p. 9); and (2) the temporal proximity between the litigation (which terminated in June 2019) and the failure to promote Plaintiff more than a year later is not unusually close. (Doc. 22, p. 10).

In response, Plaintiff argues there is sufficient evidence of causation "by way of temporal proximity and evidence in the record as a whole suggesting causation." (Doc. 26, p. 19).

More than one year passed between the date Plaintiff settled *Helm I* and *Helm II* and the date Plaintiff was passed over for this promotion. (Doc. 25-12, p. 51)

(notifying Plaintiff that the City decided to move forward with another candidate on October 8, 2020). We nonetheless find that Plaintiff has produced sufficient evidence to demonstrate a genuine issue of material fact as to whether Defendant Slaughter's decision not to promote Plaintiff in October 2020 was causally related to his protected speech. First, Plaintiff has submitted evidence that shows both the current police chief (Damon Hagan) and retiring assistant police chief (Mark Sechrist) recommended Plaintiff as their top choice for the position of assistant chief, and recommended Fred Miller as their top choice for the position of captain. Second, Plaintiff presented evidence showing that Plaintiff's prior lawsuits were discussed during the hiring process.[47] Third, Plaintiff presented evidence the litigation history

---

[47] The following exchange occurred at Joellen Chappelle Gilbert's deposition:

Q     Did anyone at the meeting mention the fact that [Plaintiff] had prior lawsuits against the city?

A     Yes, sir.

Q     Who mentioned that?

A     I can recall Janis Holmes mentioned it.

Q     And in what context did it come up, how was it relevant?

A     As him being part of the administrative team, that it would be difficult to have someone on the team who had essentially sued the city.

Q     Anyone else mention it other than her?

A     You know, I've been thinking a lot about this, I've been trying to recall if the mayor—if I could say with a hundred percent certainty and I cannot.

Q     Okay. So is it possible the mayor mentioned [Plaintiff's] lawsuits against the city?

A     Yes, It's possible, but it's been three years and I'm really having a tough time recalling who said what, but I know

of two other candidates (including Fred Miller) was discussed during the hiring process. (Doc. 25-6, pp. 26-27).[48] Fourth, Plaintiff has presented evidence that shows no candidate who sued the City in the past was promoted to assistant chief or captain by Defendant Slaughter to fill the vacancy created by Mark Sechrist's retirement.[49]

Therefore, we find Plaintiff has produced enough evidence to allow a reasonable jury to conclude that Plaintiff's prior lawsuits were a substantial factor motivating Defendant Slaughter's decision not to promote Plaintiff in October 2020. Therefore, Defendants' Motion for Summary Judgment will be denied on this basis.

---

some of the items that were discussed around the table, but who said what I'm having a tough time recalling.

(Doc. 25-6, pp. 25-26).

[48] The following exchange occurred at Joellen Chappelle Gilbert's deposition:

Q    Was the fact that Fred Miller had sued the city brought up?

A    Yes.

Q    Okay. How about Jody Miller, was the fact that he had sued the city brought up?

A    Yes.

Q    Okay. And those are the only three candidates that had sued the city, by the say, none of the other ones had?

A    To my recollection, yeah.

(Doc. 25-6, pp. 26-27).

[49] After Marlin Smith withdrew, Defendant Slaughter had five candidates for two positions. The two candidates chosen were the only remaining candidates who had never initiated any lawsuit against the City.

### 3. Plaintiff is Not Required to Prove Whether Defendants Would Have Reached the Same Decision if Plaintiff Never Engaged in Protected Speech

In reply, Defendants argue that Plaintiff "has not cited to evidence to controvert the indication that he would not have been promoted even if he had not filed his previous lawsuits." (Doc. 27, p. 6). Specifically, Defendants contend:

> [I]t is clear even from Plaintiff's own deposition testimony that reasonable minds can differ as to multiple individuals' qualifications for a position and ultimately reach a different conclusion as to who should be offered the position. Such is the case herein. Plaintiff's assertions are based on his own subjective opinion that he is the most qualified for the relevant positions, not an objective measure. As such, the Court must still conclude that there is no causal connection between his exercise of First Amendment Rights and Defendants' decision not to promote him.

(Doc. 27, pp. 5-6).

With this argument, it appears that Defendants misallocate the burden of proof. Plaintiff must show that a reasonable jury could, based on the summary judgment record, conclude that his conduct was a substantial motivating factor in Defendant Campana and Slaughter's hiring decisions. He has done so. Once this burden is met, it shifts to Defendants to show "by a preponderance of the evidence that [they] would have reached the same decision even in the absence of protected conduct."[50] As explained in *Suppan*,

---

[50] *Suppan*, 203 F.3d at 235 (quoting *Mount Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Under *Mount Healthy*'s burden-shifting substantial-factor/same-decision framework, the plaintiff is not required to prove "but for" cause in order to warrant a judgment in his favor. In this framework, the defendants, in proving "same decision," must prove that the protected conduct was *not* the but-for cause. If, in proving a substantial or motivating factor, plaintiffs were required to prove but-for causation, it would be impossible for defendants to then prove that the same decision would have been made in the absence of what the plaintiffs had already shown to be the but-for cause of the decision. While but-for causation is the ultimate question, it is the defendants' burden to prove lack of but-for causation.[51]

Accordingly, summary judgment will not be granted on this basis.

### D.   DEFENDANTS DID NOT ADEQUATELY SUPPORT THEIR ARGUMENT THAT THERE IS NO EVIDENCE OF A CITY POLICY OR CUSTOM OF RETALIATING AGAINST EMPLOYEES WHO FILE LAWSUITS AGAINST THE CITY

In his Complaint, Plaintiff alleges that the City is liable for the violation of his rights that occurred when he was denied a promotion. He identifies the following policy or custom to support that claim:

> Defendant Gabriel Campana, City of Williamsport adopted a policy or custom wherein it would retaliate against Officers for the previous filing of lawsuits against the City by refusing to promote them to the positions of Assistant Chief or Captain.

(Doc. 1, ¶ 80). As we understand it, Plaintiff alleges the existence of a "policy or custom" during Defendant Campana's tenure to retaliate against police officers for

---

[51] *Id.* at 236.

filing lawsuits against the City by denying them promotions to the positions of police chief, assistant chief, and captain.[52]

Defendants argue that Plaintiff has offered no evidence that Defendant Campana adopted such a policy, or established such a custom, of retaliating against police officers who sue the City. They do not cite, or even reference, any evidence from the record to support this argument. Thus, Defendants' assertion that there is "no evidence" cannot win the day. As explained in *Celotex*, when a moving party seeks summary judgment on the theory that the non-moving party (who will bear the burden of persuasion at trial) has no evidence:

> the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, . . . a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively

---

[52] In response to Defendants' motion for summary judgment, Plaintiff argues that summary judgment should be denied based on a different custom or policy than the one pleaded in his Complaint. Specifically, Plaintiff argues that "the custom or policy of the City of Williamsport was that the mayor decides unilaterally, in his sole discretion, who to promote to the positions of Assistant Chief and Captain." (Doc. 26, p. 23). Plaintiff is advised that he cannot amend his claims through arguments in a brief in opposition to a motion for summary judgment.

demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion.[53]

Defendants have offered the Court nothing more than the bare assertion that there is no evidence. However, they have a burden here to "affirmatively show" why the evidence is inadequate to demonstrate the existence of the custom or policy alleged in Plaintiff's Complaint.[54] They have not done so here. Accordingly, their request for summary judgment on this basis will be denied.

### E.   PLAINTIFF IS NOT REQUIRED TO PROVE COMPENSATORY DAMAGES TO WITHSTAND SUMMARY JUDGMENT

Defendants argue that, even assuming Plaintiff can prove liability, they are entitled to summary judgment because Plaintiff has not produced enough evidence to show he is entitled to compensatory damages. (Doc. 22, pp. 16-17). Plaintiff disagrees. He argues that he has offered enough evidence to show he is entitled to compensatory damages, and that even if he has not "[i]f Defendants have nominal damages arguments, they can be presented to the jury." (Doc. 26, pp. 27-28). In

---

[53] *Celotex*, 477 U.S. at 332 (Brennan, J., dissenting) (internal citations omitted).

[54] Defendants also ignore statements by Doc Miller that, on two occasions, Defendant Campana said he could not promote Plaintiff because of his lawsuits, and evidence that Plaintiff was recommended for promotion to the assistant police chief position twice, and that Defendant Campana denied the promotion twice.

reply, Defendants argue that "[d]amage is an element of any civil claim and Plaintiff carries the burden to prove the same." (Doc. 27, p. 9). We are not persuaded.

Plaintiff is not required to demonstrate compensatory damages as an element of a § 1983 claim to withstand summary judgment.[55] As explained in the commentary to the Third Circuit's Model Civil Jury Instructions for § 1983 claims:

> It is true that the plaintiff cannot recover compensatory damages without showing that the defendant's violation of the plaintiff's federal rights caused those damages. *See* Instruction 4.8.1, *infra*. It would be misleading, however, to consider this an element of the plaintiff's claim: If the plaintiff proves that the defendant, acting under color of state law, violated the plaintiff's federal right, then the plaintiff is entitled to an award of nominal damages even if the plaintiff cannot prove actual damages.[56]

Accordingly, summary judgment will not be granted on this basis.

## V.    CONCLUSION

Accordingly, for the foregoing reasons, Defendants' motion for summary judgment (Doc. 20) will be DENIED. An appropriate order will be issued.


Date: March 29, 2024                                    BY THE COURT

                                                       *s/William I. Arbuckle*
                                                       William I. Arbuckle
                                                       U.S. Magistrate Judge

---

[55] *See Johnson v. Wild Acres Lakes Prop. & Homeowners Ass'n*, No. 3:07-CV-1384, 2009 WL 2426057, at *11 (M.D. Pa. Aug. 6, 2009); *L.T. Assoc. LLC v. Sussex Cnty. Council*, No. CV 11-774-MPT, 2013 WL 3998462, at *5 (D. Del. Aug. 5, 2013) ("[C]ompensatory damages are not an essential element of a § 1983 claim, because any form of damages, even nominal damages, will satisfy the element.").

[56] 3d Cir. Model Civil Jury Instructions § 4.3, Comment (2023).